IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CARLTON HAMMACK,
      Petitioner,

vs.                             Case No. 5:07cv142/RS/EMT

WALTER A. McNEIL,[1]
      Respondent.
_____/

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 1). Respondent filed an answer to the petition with relevant portions of the state court record (Docs. 8, 9), and Petitioner filed a reply (Doc. 14).

The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are undisputed and established by the state court record (*see* Doc. 8; Doc. 9, Exs.; Doc. 14 at 2). On January 4, 2002, a grand jury in the Circuit Court in and for Washington County, Florida, returned a two-count indictment charging Petitioner with first degree premeditated murder in Count One and first degree arson in Count Two (both offenses are alleged to have occurred on or about September 30, 2001) (Doc. 9,

---

[1] Walter A. McNeil succeeded James McDonough as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d)(1).

Ex. B at 51–52).[2]  On May 16, 2002, Petitioner pleaded guilty to Counts One and Two, as charged, pursuant to a written plea agreement (Ex. A at 10–11, 30–43).  Under the terms of the agreement, the State agreed to waive the death penalty as to Court One; the sentence as to Count Two was to be decided by the trial court (*id.*).  Moreover, during the plea colloquy Petitioner's counsel stated that in light of the State's agreement to waive the death penalty, Petitioner faced a sentence of mandatory life imprisonment on Count One, and he faced a minimum sentence of thirty-four months imprisonment and a maximum sentence of thirty years imprisonment on Count Two (*id.* at 32).  The trial court accepted Petitioner's plea, adjudicated him guilty, and sentenced him to life imprisonment without the opportunity for parole on Count One and thirty years imprisonment on Count Two, to run consecutive to the sentence imposed on Count One (*id.* at 1–9, 41–42).

Petitioner appealed the judgment and sentence to the Florida First District Court of Appeal ("First DCA") (*id.* at 16).  On May 15, 2003, the First DCA affirmed per curiam without written opinion, with the mandate issuing June 10, 2003 (Exs. E, F).  Hammack v. State, 846 So. 2d 510 (Fla. 1st DCA 2003) (Table).  Petitioner did not seek certiorari review by the Florida Supreme Court or the United States Supreme Court.

On June 9, 2003, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. G at 1–13 (Rule 3.850 motion) & 14–54 (attachments to Rule 3.850 motion)).  Following an evidentiary hearing, at which Petitioner was represented by counsel, the trial court denied the motion (Ex. I; Ex. G at 178).  Petitioner appealed the decision to the First DCA (*see* Ex. J), and the appellate court affirmed per curiam without written opinion on August 12, 2005, with the mandate issuing August 12, 2005 (Exs. L, M).  Hammack v. State, 908 So. 2d 1060 (Fla. 1st DCA 2005) (Table).

On July 5, 2006, Petitioner filed in the trial court a second Rule 3.850 motion (Ex. N at 173–82 (motion) & 183–88 (attachments thereto)).  On August 11, 2006, the trial court issued an order summarily denying the motion (*id.* at 189–90).  Petitioner appealed the decision to the First DCA (*see* Exs. O, P), and the appellate court affirmed per curiam without written opinion on March

---

[2] Hereafter, all references to Exhibits will refer to those submitted by Respondent with his answer (Doc. 9).

23, 2007 (Ex. R),[3] with the mandate issuing on May 17, 2007 (Ex. U).  <u>Hammack v. State</u>, 954 So. 2d 1159 (Fla. 1st DCA 2007) (Table)

On June 8, 2007, Petitioner filed the instant habeas action (Doc. 1 at 9).  Respondent concedes that the petition is timely (Doc. 8 at 4).

II.	STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[4]  The appropriate test was described by Justice O'Connor as follows:

---

[3] On April 9, 2007, Petitioner filed a motion for rehearing in the First DCA, which was denied on May 1, 2007 (Exs. S, T).

[4] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion." Williams, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the

petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 551 U.S. 930 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

Ground One: "Petitioner's 5th, 6th, and 14th Amendment protections were violated through an involuntary plea entered through ineffective assistance of counsel."

Within Ground One, Petitioner appears to raise several subclaims of ineffective assistance of trial counsel ("IATC"). As factual support for Ground One, he states the following:

> Petitioner's plea was involuntary through counsel's misadvice that [Petitioner] would be eligible for parole; that counsel failed to investigate [Petitioner's] sanity; that Petitioner was mentally retarded [sic]; counsel never explained that the State would have to prove premeditation [as to Count One]; counsel's misadvice that [Petitioner] faced the death penalty [as to Count One], and an overall failure to advise and investigate. Petitioner unaware [sic] of all options before pleading.

(Doc. 1 at 7). Additionally, Petitioner contends that he raised in his first Rule 3.850 motion the same IATC claims he has asserted here, and Respondent states that Petitioner's IATC claims "appear[]"

to be exhausted" (Doc. 1 at 4; Doc. 8 at 10).[5]  Thus, the undersigned construes Ground One of the instant petition as actually raising the following five subclaims of IATC:   1) trial counsel erroneously advised Petitioner that, "if parole ever comes back, you'll [Petitioner] be eligible for it"; 2) counsel failed to investigate whether Petitioner was insane at the time of the offenses, due to voluntary intoxication or otherwise; thus, counsel wrongfully concluded that Petitioner had no insanity defense and failed to advise Petitioner that intoxication "can serve as a mitigator against the imposition of the death penalty"; 3) counsel failed to adequately investigate whether Petitioner was mentally retarded, and had counsel done so, he would have discovered that Petitioner was indeed mentally retarded and, therefore, ineligible for the death penalty; 4) trial counsel failed to explain to Petitioner that the State would have to prove "premeditation" in order to convict Petitioner of first degree murder; and 5) trial counsel failed to advise Petitioner that a death sentence could not be imposed because the indictment charging Petitioner was "fatally defective" under Apprendi v. New Jersey, 120 S. Ct. 2348 (2000), in that it failed to include the aggravating circumstances under which the death penalty could be imposed.   Additionally, Petitioner generally alleges that but for the ineffectiveness of his counsel, he would not have pleaded guilty and would have insisted on proceeding to trial (*see* Doc. 1 at 7; Ex. G at 1–13).  The undersigned will address each IATC claim, *infra*, after providing a summary of the evidence adduced at the evidentiary hearing on Petitioner's first Rule 3.850 motion (a review of which is necessary for the resolution of Petitioner's IATC claims).

At Petitioner's evidentiary hearing, the trial court first confirmed with Petitioner that he wished to pursue the Rule 3.850 motion, emphasizing to Petitioner that should the motion be granted and Petitioner's plea vacated, Petitioner would again be facing the possibility of the death penalty (Ex. I at 8–9).  Petitioner stated that he understood and wished to pursue the motion (*id.*).  Petitioner was then called as a witness by his counsel and testified on direct, cross, and redirect examination as follows.  He attended school through the eleventh grade but failed the eleventh grade and left school (he also testified he had previously failed the sixth grade but "retook" the sixth grade, passed

---

[5] Despite noting that Petitioner's IATC claims "appear to be exhausted," Respondent states elsewhere in his answer that the "State asserts all procedural defenses and bars available to it" (*see* Doc. 8 at 3).  Respondent, however, does not specifically contend that any of the IATC claims asserted in Ground One are unexhausted.

it, and was able to continue on to the seventh grade through part of the eleventh grade) (*id.* at 22, 24–25). Petitioner testified that before his arrest and incarceration he worked for Trawick Construction for approximately four months, and at Trawick he ran equipment, such as back hoes, dozers, and tractors (*id.* at 10, 22, 24). Occasionally Petitioner and his construction crew went out of town, and when they did, Petitioner was solely responsible for "taking care of" himself (*id.* at 22). Petitioner was living with his three children, aged fifteen, thirteen, and eleven, and he was their primary caretaker; no one else lived in the home with them (*id.* at 20–21). Petitioner stated that his children sometimes stayed with their mother, but when they lived with him he was solely responsible for their care (*id.* at 21). Before Petitioner worked for Trawick he drove semi-trucks for "a couple of years maybe or longer," and this work required Petitioner to have a commercial drivers license ("CDL") (*id.* at 23). In order to get his CDL, Petitioner took and passed a written test (*id.* at 22–23). Petitioner noted that he had been married three times, and his third wife, Mary Mills, is the victim of the murder charged in Count One (*id.* at 10–11; *see also* Ex. B at 51–52).

Petitioner was represented on the underlying murder and arson charges by Walter Smith, who—according to Petitioner—met with Petitioner three times before Petitioner entered his guilty plea (Ex. I at 12). Petitioner was asked about his discussions with Attorney Smith, and he testified that during their first meeting—which lasted fifteen to twenty minutes—he thought they went over some of the police reports, but since it had been so long ago, he did not really remember (*id.* at 12–13, 38). Petitioner testified that he could not remember when his second meeting with Attorney Smith took place, in relation to their first meeting, but he remembered that at the second meeting Attorney Smith told him the State was seeking the death penalty (*id.* at 13). At the third and last meeting Attorney Smith "mentioned about the plea" (*id.*). Additionally, Petitioner testified, at the third meeting Attorney Smith told him that "if parole come back [sic] in effect, [he]'d be eligible for it,"[6] and Attorney Smith stated "he was going to go to the State with a plea of life" (*id.* at 17, 41). With regard to the matter of parole eligibility, Petitioner clarified that Attorney Smith stated,

---

[6] Petitioner admitted that during the plea colloquy he was asked by the judge "whether any promises or anything had been told to [him]," specifically, whether "anyone made [] any promises about what would happen if [he] entered this plea other than what's been stated in court," and Petitioner responded that no such promises had been made (Ex. I at 42–43). Petitioner testified, however, that he thought the judge's questions pertained to his receiving life in prison and not about his eligibility for parole (*id.* at 47–48).

"there's no parole now, but if it comes back in effect, you'll be eligible"; Petitioner, however, acknowledged that "there's no way [Petitioner] could know or, [to] the best of [Petitioner's] knowledge, [that Attorney Smith could] know what the Legislature might do," or whether—if the Legislature reinstated parole—the Department of Corrections would determine that Petitioner was eligible for parole (*id.* at 48). Petitioner testified that could not recall when the third meeting with Attorney Smith occurred, in relation to when Petitioner entered his plea (*id.* at 17). Petitioner denied that he asked Attorney Smith to approach the State with an offer to "plead to life"; he also denied that he had "consistently been indicating to the people at the jail that [he] wanted life" and that "life" was "all [he] was trying to get out of this" (*id.* at 40).

Petitioner further testified that a "psychiatrist or psychologist" named Jill Rowan came to see him before his plea, administered a test, and "asked some questions and stuff" about the roles of the judge, defense counsel, and other courtroom personnel (*id.* at 14–15, 17).[7] Petitioner testified that he knew he was charged with murder and that he discussed with Dr. Rowan "[t]he fact that he was charged with murder and arson and that [he] knew what that [sic] was" (*id.* at 38). Petitioner and Dr. Rowan also discussed the possibility of the death penalty, and Petitioner was aware when he met with Dr. Rowan that the possible penalties he faced were "either life in prison or death," having learned of those possibilities from Attorney Smith (*id.* at 39). Petitioner noted that his meeting with Dr. Rowan lasted three hours (*see id.* at 38–39).

Regarding events that shortly preceded Ms. Mills' murder, Petitioner testified that he had been drinking "that day" and "probably" consumed eight beers (*id.* at 15). He had also "been doing crack and cocaine" (*id.*). Petitioner testified that earlier in the evening of the murder he was at the Cat's Eye, a bar, with his cousins, Jerry Yates and Ray Hammack (*id.*). When asked whether Mr. Yates or Mr. Hammack ever talked to Attorney Smith about Petitioner's drinking or use of drugs that evening, Petitioner responded, "Not about the drugs or nothing; not that I know of." (*id.* at 16).

At the evidentiary hearing, Petitioner was also questioned about confessions and statements he provided to law enforcement concerning Ms. Mills' murder (*id.* at 28–29). Petitioner admitted

---

[7] Petitioner testified that the meeting with Jill Rowan occurred before his third visit with Attorney Smith (Ex. I at 14–15, 17).

that he first confessed at the Chipley Police Department ("CPD"), where he "talked to them for a good period of time" and "told them everything about how [he] had committed the murder" (*id.* at 29; *see also* Ex. G at 105–24 (transcript of Petitioner's first confession, provided at the CPD around noon on November 30, 2001)).[8]  Petitioner testified that he relayed to CPD officers details of the events leading up to Ms. Mills' murder, including that Petitioner had made "the phone calls [to Ms. Mills]" and got "the phone card," that he made "these arrangements for her to meet [him] before the day that [he] killed her," that he "did it with a knife," and that he obtained kerosene and poured it over Ms. Mills (Ex. I at 30).  Petitioner also told CPD officers "how long this had been going on," that is, for "several months leading up to [his] actually killing her" (*id.* at 31).  Petitioner, however,

---

[8]  A transcript of Petitioner's confession at the CPD (as well as his subsequent statements/confessions) is included in the record (Ex. G at 105–77), a review of which is helpful for placing Petitioner's hearing testimony in context.  In relevant part, Petitioner stated that the weekend before the murder, he arranged to meet Ms. Mills at the Bonifay Inn, and when he arrived there they argued, but he was not sure whether Ms. Mills realized it was him (versus "the stalker," a/k/a "the different identity" assumed by Petitioner), and he did not go into her motel room (*id.* at 117–18, 135).  Petitioner noted that he devised the "stalker" plan because Ms. Mills had refused to see him, and the only way he could see her was by pretending to be someone else (*id.* at 124).  Petitioner devised the stalker plan after Ms. Mills told Petitioner she was "just using him," and he found out she was seeing someone else, noting that he loved her, did not want to share her with anyone, and wanted to see if she would actually have sex with somebody for money, which is why—according to Petitioner—she had agreed to meet "the stalker" at the Bonifay Inn (*id.* at 119–20).  Petitioner stated he arranged to meet Ms. Mills again, a week later, but this time at the Chipley Motel; Petitioner stated that Ms. Mills again agreed to meet "the stalker" so she could "get paid to have sex" (*id.* at 116, 18–19).  On September 30, 2001, which was the night of the second meeting (and the night Ms. Mills was killed), Petitioner placed a call to the Chipley Motel to ensure that Ms. Mills had checked in (*id.* at 116, 118; *see also* Ex. B at 51).  He placed the call from a TracPhone, which Petitioner had activated in late August 2001 and used to disguise his voice "as the stalker" (Petitioner noted that he had also used "calling cards" to make calls to Ms. Mills, and the calling cards were purchased for the "sole fact of posing as this other person") (Ex. G at 117, 134, 136, 175).  Petitioner stated that he went to see Ms. Mills at the Chipley Motel, not "as Carl Hammack," but as "the stalker," and when Ms. Mills opened the door to her motel room she started cursing at Petitioner and telling him that she "was just using [him]"; Petitioner was disgusted that she had actually checked in (both to this motel and the Bonifay Inn), which "proved [his] point" (that is, that he was being used, or Ms. Mills would have sex for money, or both), so as she went toward the phone in the motel room, he wrestled her down onto the floor, hit her in the mouth, covered her mouth when she tried to scream, and stabbed her approximately five to seven times with a pocket knife he had on his person (*id.* at 107–09, 122, 158).  Petitioner started to leave the scene, but then thought he should "cover [it] up," so he obtained kerosene from his truck, returned to the room, poured kerosene on Ms. Mills, lit the kerosene with a lighter, and put the kerosene bottle in the back of his truck (*id.* at 112–13, 115–16, 163).  As Petitioner left the motel room the first time (that is, before getting the kerosene out of his truck) he took the telephone from the room and later threw it and the pocket knife away, noting that he "reckon [he] was just trying to cover up what [he had] done" (*id.* at 108–10, 112, 165).  Petitioner also noted that he had thrown the TracPhone away prior to Ms. Mills' murder (*id.* at 142–43).

did not tell CPD officers that he had been using cocaine or consuming alcohol prior to the murder (*id.* at 30).

Petitioner testified that his second confession was made following his arrest on November 30, 2001 (*id.* at 31–32). Petitioner stated that he was arrested at his mother's house and transported to the Washington County Sheriff's Office ("WCSO") (*id.*). Petitioner made some statements in the patrol car during his transport to the WCSO, and he provided another full confession after he arrived at the WCSO (*see id.*; *see also* Ex. G at 64–104 (transcript of Petitioner's statements made in the patrol car, following his arrest at approximately 5:00 p.m.); Ex. G at 125–77 (transcript of Petitioner's confession at the WCSO, commencing at 6:16 p.m.)). Petitioner testified that once at the WCSO he "went all through with them exactly what [he] had been doing in terms of preparing for this [that is, Ms. Mills' murder] and working up to this" (Ex. I at 32–33). Petitioner again provided details concerning the murder, such as where he obtained the kerosene, and his "getting the phone," making calls to Ms. Mills, and disguising his voice (*id.* at 34). Petitioner also demonstrated to WCSO officers how he disguised his voice (*id.*). Petitioner further advised the officers that before he killed Ms. Mills, he tried to "get her to come to different motels," and when she did come to a motel in Chipley, he killed her, burned her, took the motel phone, threw out the phone out, and later took officers to the area where he had thrown the phone (*id.* at 34–36). Thus, Petitioner testified, he remembered not only taking the phone, but also that he threw the phone away and where he threw it away (*id.* at 36). During the WCSO interview Petitioner was asked whether he had been drinking the night of Ms. Mills' murder, and he responded that he had "three or four" at the Cat's Eye and "probably three or four maybe at Jerry's" and that he had a "buzz" but was not drunk (*id.* at 37). Petitioner made no mention of any cocaine use or drug use (*id.*). The confession made at the WCSO was—with Petitioner's knowledge—recorded and videotaped (*id.* at 32–33).

Petitioner was asked whether Attorney Smith ever asked him about his "side of the story" or his "version of what happened," and Petitioner responded, "Not that I can remember." (*id.* at 13–14). Petitioner testified that he told Attorney Smith, but no one else, about his use of cocaine near the time of the murder, but he did not tell Attorney Smith about his use of cocaine until "after [he had] been sitting [] in jail for a little while" (*id.* at 44). Petitioner was also asked whether Attorney Smith ever tried "to get any background from [Petitioner] about what [his] school records

were or anything like that," and Petitioner responded, "Not that I know of." (*id.* at 14).  In response to a question asking whether Attorney Smith had ever explained the process by which the "Court might have imposed the death penalty" (that is, a guilt phase, a penalty phase, and an "advisory sentence by the jury to the Judge"), Petitioner stated that the process was never explained to him (*id.* at 19–20).  Petitioner was also asked whether Attorney Smith ever discussed the possibility of going to trial because the "death penalty might not be applicable here because of [Petitioner's] circumstances," or because the indictment "on its face" might make Petitioner ineligible for the death penalty, and Petitioner responded, "No." (*id.* at 17–18).  Petitioner stated that he decided to plead guilty after asking Attorney Smith if "the only thing [Petitioner] have [sic] was to plead to life," and Attorney Smith responded that "that's all he [sic] seen" (*id.* at 18).  Petitioner testified that he asked Attorney Smith whether he was sure, that is, whether a plea to life was his only alternative, and Attorney Smith said, "Yes." (*id.* at 40).  Petitioner then told Attorney Smith that, "If that's all I got" then go to the State and offer a plea to life (*id.* at 40–41).  Petitioner testified that he would have gone to trial if he had not been advised that he might be eligible for parole one day (and noted that this was his "main claim"), if he knew that the issue of cocaine or alcohol intoxication "might lessen the chance of getting the death penalty," if his "possible mental retardation might have been an issue," and/or if he had undergone an evaluation by a mental health expert (*id.* at 18–19).

Petitioner admitted that it had been a "good period of time ago" since he met with Attorney Smith and that he could not remember all of the details of his meetings with him (*id.* at 26).  For example, when asked whether Attorney Smith ever told Petitioner that he had requested paperwork, documents, and witness statements from the State, Petitioner first responded, "Not that I know of," and then answered, "I don't know." (*id.*).  Likewise, when asked whether "Mr. Smith talked with [Petitioner] about all of the facts of [his] case," Petitioner responded, "I don't know." (*id.* at 39–40).  Additionally, Petitioner was asked whether Attorney Smith advised him that "juries are not real impressed and don't really like to hear about people using cocaine and coming in and killing people," and Petitioner responded that he did not know (*id.* at 44).  Petitioner was also asked whether the appeal process was explained to him by Attorney Smith, and Petitioner stated, "That I know of he didn't." (*id.*).  Furthermore, Petitioner was asked if Attorney Smith explained to him the conditions under which death row inmates are housed, and Petitioner answered, "Not that I know

of he didn't. I don't know." (*id.* at 45); Petitioner was then asked if he remembered whether a conversation of this sort regarding death row took place, and he stated "I don't remember" and acknowledged that Attorney Smith "might have discussed all of that" with him, but he did not know (*id.* at 44).

Petitioner also acknowledged that Attorney Smith spent time talking with him about his case, had "materials" with him when he went to see Petitioner, and "probably" told Petitioner about the substance of the State's evidence (*id.* at 26–27). Although Petitioner initially testified that he did not know the State had any witnesses, he later admitted that he was indeed aware the State had witnesses "because to go to trial [] the State would have to bring in people to testify" (*id.* at 27). Petitioner stated that Attorney Smith did not ask "a whole lot" of questions about Petitioner "as a person"; rather, Attorney Smith mainly talked about the plea and Petitioner's "taking the plea," but he did answer questions posed to him by Petitioner about the case (*id.* at 28, 46). Petitioner acknowledged that he was advised by Attorney Smith that the ultimate decision regarding whether to plead or go to trial was "left up to [Petitioner]" (*id.* at 46).

At the evidentiary hearing, Petitioner's counsel next called its second and final witness, Michael D'Erico, Ph.D., a clinical forensic psychologist (*id.* at 49). Dr. D'Erico testified that he was "employed continuously since 1984 in the area of forensic psychology," had conducted "probably five thousand forensic psychological evaluations," had worked in in-patient forensic settings in three states, including Florida, and had previously testified as an expert in forensic psychology in Washington County, Florida (*id.*). Dr. D'Erico testified that he evaluated Petitioner on February 12, 2004, at Century Correctional Institution (*id.* at 50–51). Prior to the evaluation, Dr. D'Erico was provided with some records regarding the offense, which he characterized as "investigational reports," and he reviewed the statement Petitioner made at the WCSO (*id.* at 51). Dr. D'Erico also obtained a release from Petitioner so he could review Petitioner's prison medical records, and he obtained a "social history" from Petitioner, as well as Petitioner's permission to call and interview Roy Hammack, Petitioner's cousin (*id.*).

Dr. D'Erico then testified that his review of a "report from law enforcement" was "enlightening," as it made it clear that Petitioner's behavior at the time of the offense was goal-directed and that Petitioner was aware of the nature and quality of his actions at the time of the

offense, although the report did suggest that Petitioner abused alcohol on "the night in question" (*id.* at 52). Dr. D'Erico testified that he reviewed only "one of the statements" Petitioner provided to law enforcement and was not aware that Petitioner "actually gave a total of three statements" to law enforcement (*id.* at 55–56). He stated further that it certainly would have been "beneficial to [him] in [his] evaluation" to have compared all three statements, although the statement he reviewed was sufficient for him to determine that Petitioner knew what he was doing at the time of the offense (*id.* at 56). Moreover, Dr. D'Erico opined, although Petitioner had consumed some alcohol, he did not consume enough to make him unaware of what he was doing at the time of the offense (*id.* at 61).

With regard to his interview of Roy Hammack, Dr. D'Erico noted that Mr. Hammack was "very concerned about what he was saying and how it might affect his cousin in court" (*id.* at 52). Nevertheless, Roy Hammack stated that Petitioner "was in the habit of abusing alcohol in the form of beer" and that he had observed Petitioner, after Petitioner drank "a few beers," become argumentative and occasionally "physically aggressive with whomever was present" (*id.*).

Dr. D'Erico testified that he administered mental status examinations, and they revealed that Petitioner "was essentially clear" and had no "significant abnormalities" (*id.* at 53, 61). Specifically, Dr. D'Erico concluded that Petitioner:

> . . . understood his situation; he understood [Dr. D'Erico's] questions. He gave relevant answers, although he did tend to mumble at times and [Dr. D'Erico] had to frequently ask him to repeat his answers. He showed no significant abnormality in perception or thought content; in other words, he wasn't crazy by the usual criteria. He wasn't having hallucinations or delusions. His mood appeared fairly steady and he -- he didn't appear to be clinically depressed in [Dr. D'Erico's] opinion.

(*id.* at 53).

Dr. D'Erico further testified that when he interviews a person charged with first-degree murder he "sometimes" looks for the presence of "mitigators" (that is, mitigating circumstances that weigh against imposition of the death penalty) (*see id.* at 51, 53–54), and after interviewing Petitioner and reviewing Petitioner's records, Dr. D'Erico concluded that the "main mitigator would possibly be the influence of alcohol intoxication and its effect on [Petitioner's] impulse control at the time of the offense" (*id.* at 53). Other mitigators would include Petitioner's "difficult time at school," and in particular, his "difficulties with reading expression and reading recognition," as well

as "the results of intelligence tests that had been given over the years where he scored, invariably, in the borderline range of intelligence" (that is, "I.Q. scores below eighty-five"), as reflected in Petitioner's school records (*id.* at 53–55).

Dr. D'Erico testified that he administered an "abbreviated version" of the Wechsler Adult Intelligence Scale Number Three, which is an I.Q. test, during his evaluation of Petitioner in February 2004 (*id.* at 61–62).[9] The test resulted in an I.Q. scale of eighty-three (*id.*). Dr. D'Erico noted that a score of eighty-three is "well above the general standard that's used for an I.Q. of [mental] retardation [that is, seventy or below]," and that in considering whether someone is mentally retarded the I.Q. score is considered along with other factors, such as "problems with adaptive functions" in areas including social adjustment and school and occupational performance that are "present and observable prior to age eighteen" (*id.* at 62–63). Dr. D'Erico stated that additional factors, such as "the person's ability in terms of self care, home living, [and] self direction," are also properly considered in determining whether a person is mentally retarded (*see id.* at 63). He noted further that a person must have at least two deficits or difficulties in adaptive functioning, in addition to "this low I.Q. score" (presumably a score of seventy or below), to be considered mentally retarded, and Dr. D'Erico did not believe Petitioner was retarded (*id.*); nor, based on his testing and other information he gathered and reviewed, did he believe Petitioner was insane at the time of the offense (*id.* at 61), even though Petitioner was motivated to help himself during his interactions with Dr. D'Erico and knew that Dr. D'Erico would later be testifying at the evidentiary hearing (*id.* at 63–64).

Dr. D'Erico testified that he reviewed Dr. Rowan's report, and in his opinion, Dr. Rowan focused solely on intelligence testing and a consideration of whether Petitioner was competent to stand trial, not whether Petitioner was insane at the time of the offense or whether mitigating circumstances or other "factors against the death penalty" existed (*id.* at 54–55). He reached this opinion, in part, because Dr. Rowan stated in her report that her "several-hour session" focused on competency and intelligence testing, and that if an assessment of Petitioner's mental state at the time of the offenses was warranted or would be helpful, to "please let [her] know" (*id.* at 64–65). Dr.

---

[9] Dr. D'Erico noted that Dr. Rowan gave Petitioner a "whole" I.Q. test, not an abbreviated version (Ex. I at 62).

D'Erico admitted, though, that he did not know what Attorney Smith and Dr. Rowan "may have discussed in their private consultation after Dr. Rowan had tested and spoken with [Petitioner]" (*id.* at 57). Dr. D'Erico also noted that he had conducted mental evaluations of defendants in the past at the request of a criminal defense attorney, and after doing so, has included in his written report those matters that "the attorney [he is] doing the evaluation for tells [him] that he wants [him] to address in [his] report" (*id.* at 58–59). For example, Dr. D'Erico testified, he may interview a defendant at the request of a defense attorney, "acting as a confidential expert," and later discuss with the attorney whether he believes the defendant was insane at the time of the offense, although his written report may only include opinions concerning the defendant's competency (*id.* at 58–60).

The defense rested, and the State called its first witness, Walter Smith, the "Deputy Public Defender" and Petitioner's defense counsel on the murder and arson charges (*id.* at 66). Attorney Smith testified that he has a Bachelor of Science degree in chemistry, as well as a law degree with honors, and he has practiced law since 1980 (*id.*). Attorney Smith noted that a "few years ago" the Florida Supreme Court promulgated a rule establishing minimum qualifications for attorneys handling capital cases, and he is certified to handle death penalty cases (*id.* at 67–68). To maintain his certification, he must annually attend a death penalty conference (*id.* at 67). He also noted that the Public Defender's Office hired him "to do capital cases" because the local counties were spending too much money paying private attorneys to handle those cases (*see id.* at 67–68). When he was hired in 1991, his job was characterized as "the capital coordinator," and thereafter his position broadened to the point that he "handled all the murder cases in the Fourteenth [Judicial] Circuit that [the Public Defender's Office] is appointed to, with some exceptions," and he estimated that he handles 90% of all murder cases in the Circuit (*id.* at 68). Thus, Attorney Smith's "area of expertise" is "primarily individuals charged with murder" (*id.*). When asked how many jury trials he had tried, Attorney Smith stated that he "kept track of the first hundred, and that was back in the eighties sometime," but he would guess that the total number of jury trials he has tried is "up in the three hundred[s]," including thirty to thirty-five first degree murder cases, and approximately seventy murder cases if first degree, second degree, and manslaughter cases are included in the total number (*id.* at 69). He noted that he never met anyone who has tried as many first degree murder cases as he has (*id.*).

Attorney Smith testified that he was court-appointed to represent Petitioner in the instant case (*id.*). Shortly thereafter, he filed a demand for discovery and received discovery from the State, including witness statements and police reports (*id.* at 70). Attorney Smith stated that he thought Petitioner requested copies of the discovery, so he mailed the discovery to Petitioner (*id.*). Attorney Smith advised Petitioner that his case did not "look too good for him," as Petitioner had confessed, the crime scene "was not an antiseptic crime scene," and Petitioner—charged with first degree murder—was facing the death penalty or life in prison, and he advised Petitioner that those were the only possible penalties for first degree murder (*id.* at 71). Attorney Smith was sure that he explained to Petitioner, based on his analysis of the case, that the best result Petitioner could expect if the case went to trial was second degree murder, <u>if</u> "the jury really believed it was a crime of passion, a heat of passion, spur of the moment kind of thing" (*id.*).[10] Attorney Smith further explained to Petitioner that he would be facing a life sentence if the jury found him guilty of second degree murder (*see id.* at 71–72), so he "made it pretty clear [that he] thought [Petitioner's] best choice in this matter was to pursue a plea to a life sentence" (*id.* at 72). Attorney Smith testified that it was his impression that Petitioner "very much wanted" him to pursue a plea to a life sentence, and when he was "able to achieve" such a plea, Petitioner was "very relieved" (*id.*).

In response to a general question regarding the mental status of a defendant, including the importance of determining whether a defendant—against whom the death penalty is sought—is retarded and therefore ineligible for the death penalty, Attorney Smith testified that he has "seen enough people [he] know[s] who may be mentally ill or who might be retarded," and in Petitioner's case it "was obvious that he was not functioning at a high intellectual level and [] was probably depressed" (*id.*). Therefore, Attorney Smith arranged for intelligence testing (*id.*). Attorney Smith noted, as an example, that if Petitioner's I.Q. score was determined to be sixty-nine, "then that's hitting a home run; then you go get the school records and everything else; then, [] you have something to work with" (*id.*). Attorney Smith explained that mental retardation "always has been,

---

[10] Attorney Smith later testified that he "just [did not] see [Petitioner] getting anything better than a life sentence" because if he tried the case and was able to get a second degree verdict, Petitioner would still get life (Ex. I at 97). He noted that he would have had to "get it all the way down to manslaughter to do [Petitioner] any good," but Petitioner was not going to get manslaughter with "twenty-something" stab wounds to the victim, so it made no sense in his (Mr. Smith's) mind to go to trial and risk the death penalty (*id.*).

to the average person seated on a jury, considered as a major mitigator," noting that everyone "understands mental retardation" and "sympathizes with somebody afflicted with it" (*id.* at 73). He discussed the importance of I.Q. and/or mental retardation in a death penalty case, noting that a "low I.Q. [is] an important major mitigating factor," and he stated that he retained the services of Dr. Rowan, in part, to determine Petitioner's I.Q. (*id.*). Attorney Smith testified that if Petitioner's score had "come out low enough" he wanted to be able to substantiate the score's validity, but he "didn't really think [Petitioner] was retarded," and he had the I.Q. test administered "out of an abundance of caution" (*id.*). Dr. Rowan was instructed by Attorney Smith as follows, "Test him and see where he scores out and give me an opinion as to competency," even though Attorney Smith assumed Petitioner was competent because he did not "pick up on any signals that [Petitioner] didn't understand what was going on," and "that's all [Mr. Smith] asked [Dr. Rowan] to put in her report" (*id.*). Attorney Smith testified that Dr. Rowan found that Petitioner scored "well above the minimum standard that is usually associated with mental retardation,"[11] noting that a score of sixty-nine equates to mental retardation, a score of seventy equates to "borderline," and a score of seventy-one means that "you're not mentally retarded," but even when scores suggest retardation "you still may not be mentally retarded," as the person's "mental functioning" would have to be assessed (*see id.* at 74–75). Attorney Smith noted that the scores assessed by Dr. D'Erico (eighty-three) and Dr. Rowan (eighty) were consistent with Attorney Smith's prediction of what Petitioner's I.Q. score would be and consistent with his interactions with Petitioner (*see id.* at 74). He also noted, concerning adaptive functioning, that Petitioner lived on his own, held a job, and had a driver's license, so no mental retardation "signals popped up," and he was convinced that Petitioner was not retarded but had him tested anyway (*id.* at 75). Once Petitioner was tested and Attorney Smith's impression (that is, that Petitioner was not retarded) was confirmed, Attorney Smith had no basis to believe or assert that Petitioner was retarded (*see id.*). With regard to Dr. Rowan's report, Attorney Smith noted that he did not want her to include certain things in her written report that would portray Petitioner in an unfavorable light in the event Petitioner's case reached the point of

---

[11] Dr. Rowan's report reflects that Petitioner's full scale I.Q. score was eighty, which puts him in the "low average" range (*see* Ex. G at 32).

a death penalty phase (as is his practice in any death penalty case), including, for example, Petitioner's obsession with Ms. Mills and his "if I can't have her no one can" attitude about Ms. Mills (*see id.* at 75–78).

Attorney Smith was next asked whether he investigated the issue of Petitioner's sanity at the time of the offenses, and he stated that he "investigated [it] to the extent we verified that he was not insane because he had no mental illness. And you can't have insanity unless you have . . . mental illness. And there was no bipolar disorder or anything like that that would qualify as mental illness, so that's as far as we went with that." (*id.* at 79). With regard to Petitioner's voluntary intoxication, Attorney Smith testified that he knew Petitioner was drinking on the night of Ms. Mills' murder, but that was not a defense and—in his opinion—not "particularly mitigating to a jury" (*id.* at 80). He noted, similarly, that cocaine use "definitely is not" mitigating, and if Petitioner had been "high as a kite on crack cocaine" he would not have revealed that information to a jury; in fact, Attorney Smith noted, he had a client on death row that was "so cracked up he almost died and it was not a defense to [that client's jury]" (*id.* at 81). Attorney Smith stated that he discussed these matters with Petitioner and advised Petitioner of his options, and that "at best," the voluntary intoxication matters should be presented to a jury during a penalty phase, as they would not "do [Petitioner] any good as to his guilt or innocence" (*id.*). He explained to Petitioner that he believed that if Petitioner proceeded to trial he would be convicted of either first or second degree murder (and he explained to Petitioner arguments he could make in support of a conviction for second degree murder), that realistically second degree murder was the best Petitioner could hope for, that he was confident Petitioner would be sentenced to life if he was convicted of second degree murder, and that—in Attorney Smith's opinion—voluntary intoxication issues are basically meaningless, even though defendants and their families often initially think that those issues are important (*id.* at 81–82). Moreover, Attorney Smith did not believe he had enough evidence to support an argument that Petitioner did not know what he was doing at the time he killed Ms. Mills (*id.* at 82).

Regarding the issue of premeditation, Attorney Smith testified that in his experience "premeditation is usually the weak link" in first degree murder cases, but in Petitioner's case the State had evidence of premeditation (some from as early as August 2001), including Petitioner's phone calls to Ms. Mills, disguising his voice, setting up the meeting at the Bonifay Inn one week

prior to Ms. Mills' murder, and arriving at the Chipley Motel with kerosene (*id.* at 83–84). Attorney Smith was also "bothered" by certain other evidence, including its potential emotional impact on the jury, such as evidence of multiple stab wounds inflicted by Petitioner; "a partially burned body, which is ugly to look at"; and Petitioner's attempted "cover up of the evidence," all of which it made the case seem worse and Petitioner more dangerous than, for example, a case where someone has "an argument with his ex-wife and ends up shooting her" (*id.* at 84–85). In Attorney Smith's opinion, the evidence against Petitioner could have resulted in a conviction for first degree murder and imposition of the death penalty, and Attorney Smith was genuinely worried that Petitioner would receive the death penalty, unlike other cases Attorney Smith had handled where he believed the State had no real chance at "getting a death penalty"(*id.* at 85). Notwithstanding, Attorney Smith felt "pretty good about getting life if push [came] to shove" (that is, if Petitioner went to trial), but he thought life was the best they could get (*id.*). He even told Petitioner that if the case went to trial, he thought he could "keep [Petitioner] from going to death row," considering that Petitioner had mitigators (that is, good and positive things to bring before the jury that might influence them to recommend life instead of death), such as no prior criminal history and a good work record, but nevertheless, Attorney Smith felt that if he could secure a plea to a life sentence, a plea would be the best course for Petitioner (*id.* at 85–86). Attorney Smith did not specifically lay out for Petitioner the aspects of the case that could be considered aggravators or mitigators; rather, he "painted the picture that there was sufficient evidence here that a jury could return a recommendation of death. There was as least one aggravating circumstance and maybe more." (*id.* at 103–04). Attorney Smith remembered discussing with Petitioner the attitude of Ms. Mills' family, including their attitude toward Petitioner during his marriage to Ms. Mills, and he explained to Petitioner that "victims play a big role in this" (*see id.* at 85–86). Attorney Smith again testified that he explained to Petitioner how, if Petitioner proceeded to trial, he could put "a good spin" on the case in an effort to secure a second degree murder conviction, and he discussed with Petitioner the evaluation of "mitigators and aggravators" (*id.*). Attorney Smith testified that he never told Petitioner that if parole came back Petitioner would be eligible for it, noting that he does not tell people facing mandatory life that they will be eligible for parole; he tells them that "life means life" (*id.* at 87).

Attorney Smith next engaged in a somewhat lengthy discussion about the indictment in Petitioner's case (as to Count One) and whether Petitioner was ineligible for the death penalty because the indictment failed to list aggravating circumstances that would warrant the death penalty (*see id.* at 88–91). Attorney Smith testified that he had made "that argument" and had not been successful, noting however, that the argument is based on <u>Ring</u>,[12] and <u>Ring</u> had not been decided prior to Petitioner's plea, although <u>Apprendi</u> had then been decided. Attorney Smith testified that if Petitioner's case had gone to trial after the <u>Ring</u> decision he would have made the argument, but even then he would not have advised "go[ing] to trial expecting" to win on that issue and that "so far it hasn't been a winner and probably won't for years to come" (*id.* at 88). He also agreed with the suggestion that, "In fact, in the State of Florida, [] it . . . is not an accurate statement of the law"; in other words, Attorney Smith agreed that aggravators do not have to be charged and pled in the indictment in order for the death penalty to be imposed (*id.*). However, Attorney Smith was asked to assume for the sake of argument that Florida law required that aggravators be charged and pled in the indictment in order for the death penalty to be imposed, and Attorney Smith was then asked whether Petitioner's indictment contained "information that actually did plead some of the aggravating circumstances that the State would have relied on" (*id.* at 88–89). In response, Attorney Smith testified that potential aggravators were evident from the indictment, including that the murder was alleged to be "cold, calculated, [and] premeditated," or similarly, "malicious, atrocious, or cruel," and that Petitioner was charged with arson in the same indictment (thus, potentially, Petitioner "while committing the crime for which he is to be sentenced, knowingly created a great risk of death to some person," or Petitioner committed murder during the commission of the arson, or both) (*see id.* at 90). Attorney Smith, however, reiterated his belief that the law (both at the time of Petitioner's plea and the evidentiary hearing) did not "automatically prohibit[] the imposition of the death penalty" (if aggravators were not listed in the indictment) (*id.* at 96). He further testified that if <u>Ring</u> had been decided prior to Petitioner's plea, he would have made the argument and preserved the <u>Ring</u> issue, but he did not believe it would have prevented the court from imposing the death penalty, although the issue could or would have been raised on appeal had the death

---

[12] <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

penalty been imposed (*id.*). Notwithstanding, Attorney Smith would still not have advised a defendant to "roll the dice hoping that five years down the road the Supreme Court throws out your death penalty" (*id.*). Thus, even "post-<u>Ring</u>," Attorney Smith's advice to Petitioner would have been the same, that is, to accept a plea to life (*id.* at 98).

Attorney Smith testified that he recalled talking to Petitioner's mother and (at least) one of his sisters, and they gave him "a little bit of the family history and the relationship [Petitioner] had with his ex-wife" (*id.* at 91). Attorney Smith also advised them of the status of Petitioner's case and told them what he thought the best outcome could be (*id.*). He noted that when he told Petitioner he "was able to get him a life sentence" Petitioner seemed very relieved, and he got the same "feeling" when he told Petitioner's mother and sister, describing the reaction of all three as, "Thank God the State's willing to offer [Petitioner] a life sentence." (*id.* at 93). He noted that he sensed no hesitation on Petitioner's part in accepting the plea, and even on the morning he was to enter his plea Petitioner asked, "Are we still going to get the life sentence," wanting to ensure it "was a done deal" (*id.*).

Attorney Smith testified that he often has clients who state they would rather get the death penalty than spend their life in prison, so he was "feeling [Petitioner] out," and although Petitioner apparently never made this statement, Attorney Smith discussed with him the dehumanizing and unpleasant aspects of being on death row (*id.* at 93–94). When Petitioner told Attorney Smith he wanted to pursue a plea to life, Attorney Smith then started "feeling out the prosecutor" and finding out from him the wishes of the victim's family (*id.* at 94). Attorney Smith was then asked the following question:

> In this particular case, after you had investigated it and considered the options, any type of possible defenses, any type of possible aggravators or mitigators in the case, and talking then with [Petitioner] and his family, [Petitioner] was very, very agreeable, was very open to that discussion and encouraged you to pursue that?

(*id.* at 95). Attorney Smith responded, "Absolutely. I can state with no hesitation that [Petitioner] was glad that we worked it out; he was relieved that we worked it out; and he [] was willing to enter the plea and take the life sentence." (*id.*).

<u>Ground One, Subclaim One: Trial Counsel Erroneously Advised Petitioner that, "If Parole Ever Comes Back, You'll [Petitioner] be Eligible for It."</u>

1.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. 466 U.S. at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. Id. at 697. Thus, this court need not address the prejudice prong if the court determines that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted).

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). Additionally with regard to counsel's performance, the Eleventh Circuit has recognized a distinction between failure to inform and giving misinformation, and has noted that the failure to inform is less likely to constitute ineffective assistance of counsel. See Holmes v. United States, 876 F.2d 1545, 1552 n.8 (11th Cir. 1989) (citing

Strader v. Garrison, 611 F.3d 61, 64–65 (4th Cir. 1979) (holding that misinformation of parole consequences is ineffective assistance of counsel)).

A petitioner satisfies the prejudice element if he establishes that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. In the context of a guilty plea, the prejudice inquiry "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process"; that is, the petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985). To establish prejudice after the petitioner has rejected an offer to plead guilty, the petitioner must "establish a reasonable probability that, absent counsel's alleged ineffective assistance, he would have accepted the plea agreement." Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991) ("[A]fter the fact testimony concerning [the] desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, [the defendant] would have accepted the plea offer."); *accord* Coulter v. Herring, 60 F.3d 1499, 1504 (11th Cir. 1995).

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Four in his first Rule 3.850 motion (Ex. G at 9–10). Petitioner appealed the state court's denial of relief, and that decision was affirmed by the First DCA in a per curiam opinion without written opinion.[13] While the First DCA did not explain its reasoning in a written opinion, this court presumes that the First DCA's decision affirms the reasoning, as well as the judgment of the circuit court. "'Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.'" Sweet v. Sec'y Dept. of Corr., 467 F.3d 1311, 1316–17 (11th Cir. 2006) (quoting Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594, 115 L. Ed. 2d 706 (1991)); *see also* Harmon v. Barton, 894 F.2d 1268, 1273 (11th Cir. 1990) (noting that the "clear inference" to be drawn from a per curiam affirmance without written opinion is that the appellate court "accepted not only the judgment but the reasoning of the trial court.").

---

[13] The same applies to the remainder of the IATC claims asserted by Petitioner in Ground One.

In the trial court's written opinion denying Petitioner's motion, the judge relied upon the reasons stated on the record at the evidentiary hearing as the basis for his decision (Ex. G at 178).[14] With regard to the instant IATC claim, the trial court found that Attorney Smith advised Petitioner that "life means life," and similarly, that Petitioner was "told that parole was not an option" (Ex. I at 111). The judge noted that Attorney Smith had described himself as "brutally honest," and the judge stated to Petitioner that he hoped Petitioner understood what "life means life" meant (*id.*). The trial court also observed that during Petitioner's plea colloquy, the victim's family was present and the prosecutor, who was required to take into consideration the wishes of the victim's family, stated "very clearly on the record" that Petitioner would be sentenced to "'Life without parole,'" but Petitioner gave no indication that he thought he would be eligible for parole (*see id.*). The court commented that if Petitioner had indeed been misadvised about the matter of parole, "the time to say, Wait a second; I just heard something [contrary to what I was told about the matter of parole]," was upon or after hearing the prosecutor's comment to Ms. Mills' family (*id.*). Thus, the trial court found that Attorney Smith's testimony was more credible than Petitioner's, and that Attorney Smith did not advise Petitioner that if parole "came back" Petitioner would be eligible for it.

The state court did not cite a state or federal case for the legal standard governing Petitioner's claim, but it is apparent from the trial court's comments in denying the claim that the standard applied by the court was whether Petitioner demonstrated that his counsel performed deficiently by providing erroneous advice regarding the matter of parole, which is consistent with the Strickland standard. *See* Early, 537 U.S. at 8 (a state court need not cite Supreme Court precedent (or even be aware of it) if the decision is consistent with the precedent); Parker v. Sec'y of Dep't of Corr., 331 F.3d 764, 775–76 (11th Cir. 2003) (same). Furthermore, the state court did not arrive at a result different from Supreme Court precedent on facts materially indistinguishable from a decision of the Supreme Court. Therefore, the state court decision was not contrary to clearly established Supreme Court law.

Additionally, Petitioner has failed to demonstrate that the state court's denial of his claim was an unreasonable application of Strickland. Determinations of credibility are best made by the

---

[14] The same applies to the remainder of the IATC claims asserted by Petitioner in Ground One.

trial court judge who can assess the demeanor and candor of the witnesses. <u>Gore v. Sec'y for Dep't of Corr.</u>, 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to credibility determinations, that deference is heightened on habeas review) (citing <u>Rice v. Collins</u>, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")); *see also* <u>Baldwin v. Johnson</u>, 152 F.3d 1304, 1317 (11th Cir. 1998) (citing <u>Marshall v. Lonberger</u>, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983) ("Title 28 U.S.C. § 2254(d) gives federal habeas [corpus] courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.")); <u>Smith v. Kemp</u>, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."). Section 2254 provides that the state court's factual findings, including credibility determinations, are entitled to deference <u>unless Petitioner presents clear and convincing evidence that rebuts the finding.</u> 28 U.S.C. § 2254(e) (emphasis added). Petitioner has not done so in this case. Therefore, the state court's credibility determination (that is, that Attorney Smith testified truthfully when he testified that he did not misadvise Petitioner about the matter of parole) is entitled to deference.

Furthermore, the record supports the trial court's factual finding that during Petitioner's plea proceedings, the prosecutor specifically stated that Petitioner was facing "life without parole" (*see* Ex. A at 34 (transcript of plea proceedings, reflecting that prosecutor asked the victim's sister whether she understood that the State was not seeking the death penalty, but pursuant to the State's plea offer Petitioner "would be sentenced to life without the eligibility of <u>any</u> type of release or <u>any</u> type of parole") (emphasis added)). The transcript further reflects that Petitioner did not "speak up," ask to speak privately with his counsel, or otherwise voice any concern about the accuracy of the prosecutor's statement, as the trial court found, even though the prosecutor's statement was made <u>before</u> Petitioner was provided with an opportunity to address the court and before Petitioner entered his plea (*see id.* at 32–44). Indeed, almost immediately after the prosecutor's statement, Petitioner was specifically asked by the judge if he "heard all of these announcements," which necessarily

included the prosecutor's statements to the victim's sister, and Petitioner responded that he had; Petitioner was also asked whether anyone had made any promises to him other than those stated in court, and Petitioner stated that no such promises had been made (*id.* at 36–37). Petitioner's subsequent contentions that he had been misadvised about the matter of parole are insufficient to rebut the "strong presumption of verity" afforded his solemn declarations on the plea form and in open court.[15] Blackledge v. Allison, 431 U.S. 63, 73–74, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977).

In light of the record, Petitioner has failed to demonstrate that the state court's rejection of his claim—that counsel misadvised him about the matter of parole—was an unreasonable application of Strickland. Therefore, he is not entitled to relief on this subclaim.[16]

> Ground One, Subclaim Two: Counsel failed to investigate whether Petitioner was insane at the time of the offenses, due to voluntary intoxication or otherwise; thus, counsel wrongfully concluded that Petitioner had no defense (that is, insanity) and failed to advise Petitioner that intoxication "can serve as a mitigator against the imposition of the death penalty."

1.    Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two-pronged Strickland standard described *supra*.

2    Federal Review of State Court Decision

Petitioner raised this claim in both Grounds One and Three of his first Rule 3.850 motion (Ex. G at 5–6, 8). In denying this claim the trial court stated as follows:

> There was the question of voluntary intoxication. Now, Mr. Smith is aware that you [Petitioner] had consumed alcohol. I would imagine that in almost all of his death cases alcohol played some part in it. He's very familiar with the alcohol defense. And he heard you explain the thing about the crack cocaine. It wouldn't have helped you any, Sport; it would have gotten the people thinking you are a bad person. Good people don't take crack cocaine. That wouldn't have played well with the jury. And I hope you understood his explanation on that.

---

[15] The "PLEA, WAIVER AND CONSENT FORM" signed by Petitioner states in relevant part, "No one has pressured me or forced me to enter this plea and no one has promised me anything to get me to enter the plea, except as follows: STATE WAIVES DEATH PENALTY ON CT I; COURT TO DECIDE SENTENCE ON CT. II." (Ex. A at 10).

[16] In light of Petitioner's failure to satisfy the deficient performance prong of the Strickland standard, the court need not analyze the prejudice prong. *See* Strickland, 466 U.S. at 697; Holladay, 209 F.3d at 1248.

(Ex. I at 110–11). It is apparent from the trial court's comments that the court denied Petitioner's claim concerning counsel's failure to investigate a voluntary intoxication defense because Petitioner failed to demonstrate that Attorney Smith's decision not to investigate this defense was unreasonable. This analysis is consistent with the <u>Strickland</u> standard; therefore, the state court decision was not contrary to clearly established Supreme Court law. *See* <u>Early</u>, 537 U.S. at 8; <u>Parker</u>, 331 F.3d at 775–76.

Additionally, Petitioner has failed to demonstrate that the state court's decision was an unreasonable application of <u>Strickland</u>. To determine whether Petitioner's counsel performed unreasonably by concluding that a voluntary intoxication defense was unavailable to Petitioner, the court must determine whether a meritorious defense existed. At the time of Petitioner's offenses and plea, Florida law expressly provided that voluntary intoxication was <u>not</u> a defense to any offense, including first degree murder. *See* Fla. Stat. § 775.051 (1999) ("Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense," except when the use of a controlled substance was pursuant to a lawful prescription);[17] <u>Barrett v. State</u>, 862 So. 2d 44 (Fla. 2d DCA 2003) (noting in relevant part that voluntary intoxication is not a defense to premeditated murder). Therefore, Attorney Smith did not perform deficiently by concluding that voluntary intoxication was not a defense to the charges faced by Petitioner, and even if Attorney Smith failed to investigate whether Petitioner was intoxicated, Petitioner was not prejudiced by any such failure because voluntary intoxication is not a defense.

Regarding counsel's failure to advise Petitioner that voluntary intoxication may serve as a factor mitigating against imposition of the death penalty, it does not appear that the state court adjudicated this aspect of Petitioner's claim. However, upon de novo review of the claim, the undersigned concludes that Petitioner has failed to satisfy the <u>Strickland</u> standard because he failed

---

[17] The act became effective October 1, 1999. *See* 1999 Fla. Laws ch. 99-174, § 2.

to demonstrate that Attorney Smith's failure to advise him that voluntary intoxication is a mitigating circumstance (hereafter referred to as Attorney Smith's "omission") was unreasonable or that he was prejudiced by the omission.

With regard to the performance prong, the court will assume, without deciding, that Attorney Smith failed to advise Petitioner that voluntary intoxication is a mitigating factor a jury may consider in deciding whether to recommend the death penalty (*see* Fla. Stat. § 921.141 (6)(f) (mitigating circumstances include the following: "[t]he capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired")). By Petitioner's own admission, although he had consumed six to eight to beers prior to Ms. Mills' murder, he was not drunk but was only "buzzed." Likewise, Dr. D'Erico testified that although Petitioner had used alcohol on the night of the murder, in his opinion Petitioner did not consume enough alcohol to make him unaware of what he was doing. As to Petitioner's alleged use of cocaine, Petitioner has merely stated that he had "been doing crack and cocaine"; he has not alleged that he was impaired by cocaine or under its influence at the time of Ms. Mills' murder. Moreover, the evidence of record demonstrates that Petitioner was well aware of his actions at the time of the offenses, despite his voluntary use of alcohol or cocaine, or both. For example, Petitioner was able to place strategic phone calls to Ms. Mills, drive to and away from the Chipley Motel, commit the murder, take the phone from her motel room, conclude that he should set the crime scene on fire and discard incriminating evidence (and carry out those plans), and very clearly recall the details of the murder to law enforcement officials. In light of these facts, it would not have been unreasonable for counsel to conclude that had Petitioner proceeded to trial and a death penalty phase, the trial court would have determined that his voluntary intoxication did not actually qualify as a mitigating factor. *See* <u>Trease v. State</u>, 768 So. 2d 1050, 1055 (Fla. 2000) (the trial court may find that an established mitigating factor is entitled to <u>no</u> weight for reasons or circumstances unique to the case); <u>Johnson v. State</u>, 608 So. 2d 4, 13 (Fla. 1992) ("While voluntary intoxication or drug use might be a mitigator, whether it actually is depends upon the particular facts of a case."); <u>Merck v. State</u>, 975 So. 2d 1054, 1064–65 (Fla. 2007) (competent and substantial evidence supported the trial judge's finding that Merck's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was <u>not</u> substantially impaired" where Merck

"successfully caught keys thrown to him just moments before the stabbing, despite his alleged alcohol consumption"; he had no trouble walking at the time of the murder as a result of his alcohol consumption; his "efforts to evade police after the stabbing, such as abandoning the car, changing clothes, and hiding in bushes, indicate that he was not too drunk to appreciate the criminality of his actions"; and "the State's expert psychologist testified that he did not believe that impairment from Merck's personality disorder or his alcohol consumption rose to the level of this statutory aggravator because he concluded that Merck made conscious decisions to behave as he did") (emphasis added); Douglas v. State, 878 So. 2d 1246, 1260 (Fla. 2004) (trial court did not err in rejecting voluntary intoxication as a mitigator because no evidence was presented that Douglas was actually impaired by alcohol at the time of the crime).

Additionally, Petitioner has not shown a reasonable probability that, but for Attorney Smith's omission, he would have rejected the plea deal and insisted on proceeding to trial. As previously discussed, to meet the prejudice prong of the Strickland standard in a plea situation, Petitioner must prove that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. Hill, 474 U.S. at 59. Often this analysis hinges upon whether eradication of the error would have led counsel to change his recommendation as to the plea, which in turn generally depends on whether the outcome of a trial would have been substantively different. Id. at 59–60. While counsel can be deemed ineffective under Strickland for failing to provide proper advice during the plea process, Petitioner must come forth with objective evidence to show that but for counsel's errors he would not have accepted the plea offer, and would have insisted on going to trial. See Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991); Toro v. Fairman, 940 F.2d 1065, 1068 (7th Cir. 1991). Conclusory, after-the-fact statements that Petitioner would not have pled guilty do not meet this requirement; nor is it sufficient to say that Petitioner would have received a less harsh sentence had he not accepted the plea offer. See Diaz, 930 F.2d at 835; see also Roach v. Roberts, 2010 WL 1544635, at *2 (11th Cir. April 20, 2010) ("[A] petitioner's bare allegation that he would not have pleaded guilty is insufficient to establish

prejudice under <u>Strickland</u> . . . .");[18] <u>Johnson v. Duckworth</u>, 793 F.2d 898, 902 n.3 (7th Cir. 1986). Here, it is evident from Attorney Smith's testimony at the evidentiary hearing that further investigation into Petitioner's voluntary consumption of drugs or alcohol or both would not have changed his recommendation as to the plea. Furthermore, Petitioner has merely made conclusory, after-the-fact statements that he would have gone to trial had he been advised that voluntary intoxication is a mitigating factor that weighs against imposition of the death penalty. In the absence of any objective evidence that but for counsel's omission, Petitioner would not have accepted the plea offer and would have insisted on going to trial, he has failed to satisfy the <u>Strickland</u> standard.

Lastly, to the extent Petitioner alleges he was "insane" at the time of the offenses due to a mental defect (as opposed to resulting from his use of alcohol or drugs), and counsel performed deficiently by failing to investigate the issue, Petitioner's claim fails. Initially, and as discussed more fully *infra*, the record establishes that prior to Petitioner's plea Attorney Smith investigated Petitioner's mental status, and his investigation revealed that Petitioner had no underlying mental defect or illness (*see* Ex. I at 79 (Smith's testimony); Ex. G at 31–34 (Dr. Rowan's report)). Thus, Attorney Smith did not perform deficiently in this regard. However, even if Attorney Smith performed deficiently (for example, by focusing his investigation on the issue of whether Petitioner was mentally retarded), Petitioner cannot demonstrate prejudice, as he has offered no evidence to support his allegation of insanity, and the record refutes any such allegation. Dr. Rowan noted in her report that Petitioner had no history of mental illness or any signs of a major mental disorder, and Dr. D'Erico—Petitioner's own witness—testified that in his opinion Petitioner had no "significant abnormalities," was not "crazy," did not experience hallucinations or delusions, his mood was fairly steady, and he did not appear depressed (Ex. G at 33; Ex. I at 53). Petitioner, therefore, is not entitled to relief, as he has failed to satisfy either prong of the <u>Strickland</u> standard.

> <u>Ground One, Subclaim Three: Counsel failed to investigate whether Petitioner was mentally retarded, and had counsel done so he would have discovered that Petitioner was indeed mentally retarded and, therefore, ineligible for the death penalty.</u>

---

[18] The undersigned cites <u>Roach</u> only as persuasive authority and recognizes that the opinion is not considered binding precedent. *See* U.S. Ct. of App. 11th Cir. Rule 36-2, 28 U.S.C.A.

1.      Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two-pronged <u>Strickland</u> standard described *supra*.

2       Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his first Rule 3.850 motion (Ex. G at 5–6).  In denying this claim the trial court found that Petitioner's I.Q., "be it seventy-nine or eight-one [sic] or eighty-three, doesn't qualify" and that prior to Petitioner's plea Attorney Smith obtained and considered information regarding Petitioner's I.Q. score (*see* Ex. I at 110).  It is apparent from the trial court's comments in denying the claim that the standard applied by the court was whether Petitioner demonstrated that his counsel performed deficiently by failing to investigate whether he was mentally retarded, which is consistent with the <u>Strickland</u> standard.  *See* <u>Early</u>, 537 U.S. at 8; <u>Parker</u>, 331 F.3d at 775–76.  Furthermore, the state court did not arrive at a result different from Supreme Court precedent on facts materially indistinguishable from a decision of the Supreme Court.  Therefore, the state court decision was not contrary to clearly established Supreme Court law.

Additionally, Petitioner has failed to demonstrate that the state court's denial of his claim was an unreasonable application of <u>Strickland</u>.  The record irrefutably establishes that Attorney Smith investigated the issue of Petitioner's retardation.  Specifically, Attorney Smith testified that he arranged for I.Q. testing by Dr. Rowan, and she determined that Petitioner's full scale I.Q. score was eighty.  As the trial court found, an I.Q. score of eighty "doesn't qualify."  In other words, such a score is well above seventy, the threshold score for mental retardation, *see, e.g.*, <u>Cherry v. State</u>, 959 So. 2d 702 (Fla. 2007), and refutes Petitioner's claim that he is mentally retarded (especially considering, as Attorney Smith did, that Petitioner was able to live on his own, hold a job, and maintain a drivers license).  Thus, as the trial court found, Attorney Smith did not perform deficiently because he did investigate the issue of Petitioner's mental retardation.  The result of his investigation was an opinion offered by Dr. Rowan, which—like that of Dr. D'Erico—was that Petitioner was not mentally retarded.

In light of the record, Petitioner has failed to demonstrate that the state court's rejection of his claim—that Attorney Smith failed to investigate whether Petitioner was mentally retarded—was

an unreasonable application of <u>Strickland</u>.  Accordingly, Petitioner has failed to demonstrate that he is entitled to federal habeas relief.

> <u>Ground One, Subclaim Four:  Trial counsel failed to explain to Petitioner that the State would have to prove "premeditation" in order to convict Petitioner of first degree murder.</u>

1.      Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged <u>Strickland</u> standard described *supra*.

2       Federal Review of State Court Decision

Petitioner raised this subclaim in Ground Three in his first Rule 3.850 motion (Ex. G at 8), but it does not appear that the trial court adjudicated this claim.  Notwithstanding, de novo review of the claim reveals that Petitioner is not entitled to relief.

Initially, Attorney Smith testified (and the record reflects) that the State had ample evidence of premeditation.  He further testified that he explained to Petitioner his belief that the best result he could obtain following trial would be a conviction for second degree murder, which he described to Petitioner as a "crime of passion" or "spur of the moment kind of thing," and he explained to Petitioner the arguments he could make in support of a second degree murder conviction instead of a first degree murder conviction.  While Attorney Smith did not specifically testify (and was not asked during the evidentiary hearing) whether he explained to Petitioner that premeditation is an element of first degree murder, his explanation of the difference between first and second degree murder would necessarily involve an explanation of the elements of each offense.

Additionally, Attorney Smith testified that because second degree murder carried a penalty of life imprisonment (and he believed that the trial court would have sentenced Petitioner to life imprisonment upon a conviction for second degree murder), and life imprisonment was being offered by the State, it made no sense to him (Attorney Smith) for Petitioner to go to trial on first degree murder and risk imposition of the death penalty, especially considering the ample evidence of premeditation in Petitioner's case.

Under these circumstances, Petitioner has not shown that no competent counsel would have advised Petitioner as Attorney Smith did here; that is, that he should accept a plea to life, rather than

risk a death sentence, in light of the amount of evidence against Petitioner, including ample evidence of premeditation. Indeed, based on the state court record, this court cannot conclude that counsel's performance was not "reasonable considering all the circumstances" or that counsel committed "serious derelictions" of his duty. Stano v. Dugger, 921 F.2d 1125, 1150–51 (11th Cir. 1991). The record reveals that counsel fulfilled his responsibility to investigate and evaluate Petitioner's options in the course of the legal proceedings and to advise Petitioner as to the merits of each. *Id.* at 1152; *see also* Wofford v. Wainwright, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam) ("[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial."). Therefore, Petitioner has not met the first prong of Strickland.

However, even if counsel had performed deficiently, Petitioner is still not entitled to relief because he has not met the second prong of Strickland. As discussed *supra*, to meet the prejudice prong of the Strickland standard in a plea situation, Petitioner must prove that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. Hill, 474 U.S. at 59. Here, Petitioner has failed to come forth with objective evidence to show that but for counsel's error (that is, his failure to explain that premeditation is an element of first degree murder), he would not have accepted the plea offer and would have insisted on going to trial. Diaz, 930 F.2d at 835 (11th Cir. 1991); Toro, 940 F.2d at 1068. Thus, as before, Petitioner's conclusory, after-the-fact statements that he would not have pled guilty fail to establish prejudice.

Accordingly, Petitioner has failed to show that his counsel's performance was deficient, or if it was deficient, that he would not have accepted the plea offer but for the deficient performance. Therefore, Petitioner's ineffective assistance of counsel claim is without merit.

> Ground One, Subclaim Five: Trial counsel failed to advise Petitioner that a death sentence could not be imposed because the indictment charging Petitioner was "fatally defective," under *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000), in that it failed to state the aggravating circumstances under which the death penalty could be imposed.

1.      Clearly Established Supreme Court Law

The clearly established Supreme Court law governing claims of ineffective assistance of counsel is the two pronged <u>Strickland</u> standard described *supra*.

2       Federal Review of State Court Decision

Petitioner raised this claim as Ground Five in his first Rule 3.850 motion (Ex. G at 10–11). In denying this claim, the trial court stated as follows:

> You [Petitioner] heard Mr. Smith say today that while there is the <u>Ring</u> decision today, it's not being embraced by the Florida Supreme Court.  And, by the way, at the time of your case, the <u>Ring</u> decision wasn't on the books; there [was] only <u>Apprendi</u>, and that case didn't do you as much good as <u>Ring</u>.  And I find that [Mr. Smith's] opinion as to the efficacy of those arguments is valid, given the current composition of the Court.

(Ex. I at 112).

It appears from the trial court's comments in denying the claim that the standard applied by the court was whether Petitioner demonstrated that his counsel performed deficiently by failing to advise him that he was ineligible for the death penalty (based upon alleged defects in Petitioner's indictment), which is consistent with the <u>Strickland</u> standard.  *See* <u>Early</u>, 537 U.S. at 8; <u>Parker</u>, 331 F.3d at 775–76.  Even assuming, however, that the state court unreasonably applied the <u>Strickland</u> standard, which would take consideration of this claim outside the deferential scope of review set forth in section 2254(d)(1), after conducting a de novo review of the claim the undersigned reaches the same result as the state court on the issue of whether Petitioner received ineffective assistance of counsel.  *See* <u>Purvis</u>, 451 F.3d at 738.

Regarding the first prong of the <u>Strickland</u> analysis, Petitioner must show that no competent counsel would have taken the action that his counsel took (in this instance, failing to advise Petitioner that he was ineligible for the death penalty because the indictment failed to list aggravating circumstances under which the death penalty could be sought or imposed).  Initially, as Petitioner acknowledges, <u>Ring</u> had not been decided at the time of Petitioner's plea; therefore, counsel cannot be deemed ineffective for failing to advise Petitioner of the ramifications or meaning

of a case yet to be decided.[19]  Moreover, the Fifth Amendment right to presentment or indictment of a grand jury has yet to be held applicable to the states.  *See* <u>Apprendi</u>, 530 U.S. 466, 477 n.3, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) ("[The Fourteenth] Amendment has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' that was implicated in our recent decision in <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998)"); <u>Hurtado v. California</u>, 110 U.S. 516, 4 S. Ct. 111, 28 L. Ed. 232 (1884) (due process guarantee does not require an indictment by a grand jury in a state murder prosecution).  Indeed, the Florida Supreme Court has rejected constitutional challenges, based on <u>Apprendi</u>, to an indictment for failure to list in the indictment the aggravating circumstances that the State intend to prove.  *See* <u>Zommer v. State</u>, 31 So. 3d 733, 753 (Fla. 2010).  Thus, Petitioner has failed to establish that no competent counsel would have failed to advise him, based on the authority of <u>Apprendi</u>, that his indictment was "fatally defective."

Even assuming that Attorney Smith performed deficiently in failing to advise Petitioner of defects in his indictment, Petitioner cannot show prejudice.  As discussed *supra*, to meet the prejudice prong of the <u>Strickland</u> standard in a plea situation, Petitioner must prove that there is a reasonable probability that, but for counsel's error, he would not have pled guilty and would have insisted on going to trial.  <u>Hill</u>, 474 U.S. at 59.  Here, Petitioner has failed to come forth with objective evidence to show that but for counsel's error (that is, counsel's failure to advise him of alleged defects in the indictment), he would not have accepted the plea offer, and would have insisted on going to trial.  <u>Diaz</u>, 930 F.2d at 835 (11th Cir. 1991); <u>Toro</u>, 940 F.2d at 1068. Therefore, as with the previous subclaim, Petitioner's conclusory, after-the-fact statements that he would not have pled guilty fail to establish prejudice.

Accordingly, Petitioner has failed to show that his counsel's performance was deficient, or if it was deficient, that Petitioner would not have accepted the plea offer but for the deficient performance.  Therefore, Petitioner's ineffective assistance of counsel claim is without merit, and Petitioner is not entitled to relief.

---

[19] In <u>Ring</u>, the United States Supreme Court held that "a sentencing judge, sitting without a jury, [may not] find an aggravating circumstance necessary for imposition of the death penalty." <u>Ring</u>, 536 U.S. at 609.  Instead, "the Sixth Amendment requires that [those circumstances] be found by a jury." *Id.*

<u>Ground One, "Cumulative Effect" Subclaim: Petitioner alleges that but for the foregoing instances of IATC, he would have not entered a plea and would have insisted on going to trial.</u>

Petitioner raised this claim in his first Rule 3.850 motion (*see* Ex. G). The state court concluded that none of Petitioner's alleged individual errors amounted to ineffective assistance of counsel and, therefore, denied his motion for post-conviction relief (Ex. I at 109–13).

The Supreme Court has not recognized the cumulative error doctrine in the context of an ineffective assistance of counsel claim.[20] Although the Eleventh Circuit has noted, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary, *see* <u>United States v. Ramirez</u>, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting <u>United States v. Thomas</u>, 62 F.3d 1332, 1343 (11th Cir.1995)), <u>United State v. Adams</u>, 74 F.3d 1093, 1099–1100 (11th Cir. 1996) (citing <u>United States v. Preciado-Cordobas</u>, 981 F.2d 1206, 1215 n.8 (11th Cir. 1993)), the Eleventh Circuit has not expressly recognized a freestanding "cumulative effect" claim, based upon the assertion that alleged errors of the trial court, defense counsel, or the State, or a combination thereof, rendered the trial fundamentally unfair even though such errors were individually harmless or non-prejudicial, as cognizable in federal habeas. *See, e.g.,* <u>Conklin v. Schofield</u>, 366 F.3d 1191, 1210 (11th Cir. 2004) (applying pre-AEDPA standard of review and denying claim that trial court errors and conduct of trial counsel combined to rob petitioner of fair trial and sentencing, but not relying upon Supreme Court precedent for its decision); <u>Sims v. Singletary</u>, 155 F.3d 1297 (11th Cir. 1998) (applying pre-AEDPA standard of review and holding that district court erred in finding that cumulative guilt stage errors prejudiced petitioner during penalty phase); <u>Cargill v. Turpin</u>, 120 F.3d

---

[20] The Eleventh Circuit recently noted "the absence of Supreme Court precedent applying cumulative error doctrine to claims of ineffective assistance of counsel." <u>Forrest v. Fla. Dep't of Corr.</u>, 2009 WL 2568185, at *4 (11th Cir. Aug. 21, 2009) (unpublished). The court cautioned that the Supreme Court has held that "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at *5 (quoting <u>United States v. Cronic</u>, 466 U.S. 648, 659 n. 26, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984)).

1366, 1386 (11th Cir. 1997) (applying pre-AEDPA standard of review and declining petitioner's invitation to entertain "cumulative error" claim because petitioner's trial was not fundamentally unfair); Dobbs v. Kemp, 790 F.2d 1400, 1505 (11th Cir. 1986) (applying pre-AEDPA standard of review and denying petitioner's claim that improper prosecutorial argument and evidentiary errors rendered trial fundamentally unfair and citing Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1973)); Bronstein v. Wainwright, 646 F.2d 1048, 1056 (5th Cir. 1981) (same).[21]

In any event, cumulative error analysis should evaluate only matters determined to be in error, not the cumulative effect of non-errors. *See* United States v. Barshov, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir. 1987) ("Mullen cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero."); *see also* United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006); Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation); United States v. Hardy, 224 F.3d 752, 757 (8th Cir. 2000); Angelone, *supra*; Moore v. Reynolds, 153 F.3d 1086, 1113 (10th Cir.1998); United States v. Rivera, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should

---

[21] The law of the other circuit courts of appeals is mixed on the issue of whether a claim of "cumulative effect" or "cumulative error" is cognizable on federal habeas. The Fourth, Sixth and Eighth Circuits do not recognize cumulative error claims on federal habeas. *See* Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) (claims of cumulative error are not cognizable on federal habeas because the Supreme Court has not spoken on this issue); Fisher v. Angelone, 163 F.3d 835, 852–53 (4th Cir. 1998) (ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."). The Ninth Circuit recognizes cumulative error claims and expressly recognized Chambers v. Mississippi, 410 U.S. 284 (1973) as the clearly established federal law governing such claims. *See* Parle v. Runnels, 505 F.3d 922, 928–29 (9th Cir. 2007). The Tenth Circuit recognizes cumulative error claims and recognized Brecht v. Abrahamson, 507 U.S. 619 (1993) as the clearly established federal law on this issue. *See* Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). The Second and Seventh Circuits recognize cumulative effect analysis of individual claims of ineffective assistance of counsel in applying the prejudice prong of Strickland. *See* Williams v. Washington, 59 F.3d 673, 682–84 (7th Cir. 1995); Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991).

evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.");

United States v. Conteh, 234 Fed. Appx. 374, 2007 WL 1229043 (6th Cir. 2007). Thus, Petitioner

must show error with respect to at least two of his individual claims.

In the instant case, none of the alleged errors of trial counsel, considered alone, approach the

threshold standard of ineffective assistance of counsel. Taken together, their cumulative effect also

falls far short of depriving Petitioner of effective assistance of counsel or a fundamentally unfair

trial. Therefore, Petitioner is not entitled to federal habeas relief on this claim. *See* Bronstein v.

Wainwright, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as

to amount to a denial of due process before federal habeas relief can be appropriately applied.")

(internal quotation and citation omitted)); *see also* Walls v. McNeil, No. 3:06cv237/MCR, 2009 WL

3187066, at **30–31 (N.D. Fla. Sept. 30, 2009) (unpublished) (same).

<u>Ground Two: "Newly Discovered Evidence or the Fact that Petitioner's 5th Amendment Right Against Self-Incrimination was Violated."</u>

As factual support for this claim, Petitioner alleges that an individual involved with the

investigation of Ms. Mills' murder told Petitioner's family that he would testify that Petitioner's

confession was obtained in violation of the Fifth Amendment and/or was obtained as a result of

police misconduct, rendering Petitioner's confession "constitutionally infirm" (Doc. 1 at 7).[22]

Respondent contends this claim is unexhausted and procedurally barred from federal review, or

alternatively, without merit (Doc. 8 at 25–28).

Petitioner did not raise this claim in his first Rule 3.850 motion. In his second Rule 3.850

motion he raised one claim and framed the issue as follows:

> Newly discovered evidence has revealed that [Petitioner's] plea in this case was rendered unknowing and involuntary due to the fact that counsel had been made aware that the police had violated [Petitioner's] rights regarding his confession, and the evidence attained therefrom, but failed to file a motion to suppress this illegally obtained confession and evidence.

(Ex. N at 176).

---

[22] Petitioner offers no other factual support for this claim, other than stating in his reply that the unnamed investigator is "ready, willing, and available to testify that not only were there constitutional defects in the manner in which authorities handled Petitioner's statements, but there was a conscious effort by authorities to hide these errors from discovery" (Doc. 14 at 9).

The trial court summarily denied Petitioner's claim in a written order (Ex. O at 189–90). Petitioner filed a motion for rehearing, which was denied by the trial court (*id.* at 230–34). Petitioner appealed the denial of his second Rule 3.850 motion, but the decision of the trial court was affirmed by the First DCA in a per curium order without written opinion (Exs. P, R, U). Petitioner filed with the First DCA a motion for rehearing, which was denied (Ex. S, T).

Upon review of the state court record, the undersigned concludes that regardless of whether Petitioner fairly presented his federal claim to the state courts, his claim is without merit. *See* 28 U.S.C. § 2254(b)(2) (section 2254 petition may be denied on the merits notwithstanding the petitioner's failure to exhaust state court remedies). In the second Rule 3.850 motion, Petitioner stated that on May 5, 2006, an unnamed person (hereafter "investigator") advised Petitioner's family that the police "totally 'messed up' their investigation of this murder" and violated Petitioner's "rights under Miranda," and that he (the investigator) told Attorney Smith of these matters, but Attorney Smith "completely ignored them" (Ex. N at 177).[23] Petitioner stated that the investigator explained to his family that Petitioner's initial confession was inadmissible because Petitioner "had not been Mirandized" (*id.*). Petitioner alleged that the confession was the "linchpin of this case," and when he confessed, it "surprised" the police because he "was only duly being routinely questioned as a possible suspect" (*id.* at 178). Petitioner stated that after he gave this "unexpected confession," the police allowed him to leave, stating that he should go home and "tell his mother 'what he did'" (*id.* at 177). In speaking to Petitioner's family, the investigator theorized that law enforcement allowed Petitioner to leave and go home "in an effort to put some space between the officers and the [Petitioner] because they realized that they had just made a huge error and needed some time to consult with officers on how to make the charge 'stick' and bring [Petitioner's] confession in legally" (*id.*). Lastly, Petitioner stated that the investigator was "adamant" that Petitioner's rights had been violated, and because Petitioner's initial confession was illegal, "all further evidence received afterwards [including Petitioner's subsequent confessions] was truly 'fruit of the poisonous tree'" (*id.* at 178).

---

[23] In resolving this claim the undersigned largely relies on the facts alleged by Petitioner in his second Rule 3.850 motion because the instant petition contains only scant facts in support of the claim.

Case No. 5:07cv142/RS/EMT

Petitioner additionally alleged that the investigator's "facts" can be corroborated by reading a transcript of the statements he made on November 30, 2001 (*id.* at 177). Petitioner also attached to the motion affidavits from his family regarding the statements made by the investigator. And, Petitioner alleged that he would not have pled guilty had he known his confession was illegal or had Attorney Smith filed a motion to suppress (*id.* at 177–78). In conclusion, Petitioner stated that Attorney Smith was ineffective in failing to "further investigate" the legality of Petitioner's confession and in failing to file a motion to suppress (*id.* at 179).

To the extent Petitioner's claim is construed as an IATC claim, the law governing his claim is the two-pronged <u>Strickland</u> standard set forth *supra*, but to determine whether Attorney Smith performed deficiently by failing to seek suppression of Petitioner's confession, the court must determine whether a meritorious basis for suppression existed.

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the Supreme Court held that protecting a suspect's Fifth Amendment privilege against self-incrimination requires that he be warned prior to "custodial interrogation" that he has the right to remain silent and to have an attorney present. "A defendant is in custody for the purposes of Miranda when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" <u>United States v. Brown</u>, 441 F. 3d 1330, 1347 (11th Cir. 2006) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)). "Interrogation," under <u>Miranda</u>, "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" <u>United States v. Gomez</u>, 927 F.2d 1530, 1538 (11th Cir. 1991) (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). The Supreme Court has defined an "incriminating response" as "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." <u>Innis</u>, 446 U.S. at 302 n.5, 100 S. Ct. 1682 (emphasis omitted).

In considering the instant claim, the court first notes that the claim appears to based on the opinion of a non-lawyer regarding the admissibility of Petitioner's initial confession and evidence

obtained subsequent thereto.[24]  However, it is not the role of an investigator—nor is an investigator or lay person trained or qualified—to render legal opinions regarding the admissibility of evidence in a criminal trial.  Moreover, as noted *supra*, Petitioner has not identified the investigator or provided a statement authored or verified by the investigator.  Thus, to the extent Petitioner relies entirely on the opinion of a lay person and/or the hearsay statements of family members to support his claim, he has failed to establish that a meritorious basis existed to suppress his initial confession or any evidence obtained subsequent thereto.

Additionally, Petitioner's own allegations demonstrate that no meritorious basis existed for suppressing his confession.  Petitioner specifically states that law enforcement was "surprised" when he first confessed at the CPD because he "was only duly being routinely questioned as a possible suspect" (Ex. N at 177–78).  Additionally, Petitioner acknowledges that he was allowed to leave after providing his "unexpected confession" (*id.* at 177).  Thus, Petitioner's allegations establish that he was not in custody for the purposes of Miranda because there had been no "'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  Brown, 441 F. 3d at 1347 (quoting Beheler, 463 U.S. at1125).  Furthermore, although the court need not make a finding as to whether Petitioner was actually "interrogated" when he initially confessed (because he was not then "in custody," and Miranda warnings were therefore not required), Petitioner's allegation that CPD officers were "surprised" by his confession militates against such a finding.  As noted *supra*, "interrogation" under Miranda "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  Gomez, 927 F.2d at 1538 (quoting Innis, 446 U.S. at 301).  The fact that the police were surprised by Petitioner's confession suggests that they did not know their actions would likely elicit an incriminating response from Petitioner.

Further, although Petitioner appears to allege that a basis for suppression is evident from a review of the transcripts of his statements, a review of those transcripts suggests otherwise.  As

---

[24] Petitioner does not identify the person as a lawyer and states only the person was involved in the investigation of Ms. Mills' murder.

previously noted, Petitioner provided three statements on November 30, 2001. The first statement was provided around noon at the CPD and is the statement/confession Petitioner claims was obtained in violation of <u>Miranda</u> (Ex. G at 105–24). The transcript of this statement, in relevant part, reflects Petitioner's acknowledgment that he came to the CPD "under his own free will," and that although he rode to the CPD in "[their] vehicle," Petitioner "had the choice to ride in his own vehicle" (*id.* at 106). Petitioner further acknowledged that he was advised he could leave at any time and that he had not been threatened, coerced, or promised anything in order to get him to make a statement (*id.*). Moreover, as noted *supra*, Petitioner was permitted to leave following the statement and was not arrested until nearly five hours later at his mother's house. Whether Petitioner was "in custody" at the CPD during this statement, which was made well before his formal arrest, depends on whether "under the totality of the circumstances, a reasonable man in [his] position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave." <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996). The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant. *Id.* Under the circumstances here—including that Petitioner was offered the option of driving to the CPD in his own vehicle, he was specifically told he was free to leave after he got to the CPD, and he was indeed permitted to leave following his statement—a reasonable man would clearly have felt free to leave the CPD. When Petitioner was formally arrested later that day he was, appropriately so, then provided with <u>Miranda</u> warnings (*see* Ex. G at 64–65), and his second and third statements followed those warnings.[25] Thus, contrary to Petitioner's contention, the transcripts reflect that no meritorious basis existed to suppress any of Petitioner's incriminating statements, including the first statement at issue here. Petitioner has therefore failed to show that Attorney Smith performed deficiently in failing to file a motion to suppress, or that Petitioner was prejudiced by counsel's failure to do so. Accordingly, Petitioner is not entitled to federal habeas relief.

---

[25] The second "statement" is actually a conversation between Petitioner and law enforcement, that takes place in a patrol car just after Petitioner was arrested at his mother's house around 5:00 p.m. (*id.* at 64–104). The transcript of this conversation reveals that Petitioner was advised of his <u>Miranda</u> warnings before being asked any questions (*id.* at 64–65). The third statement was made shortly thereafter, once Petitioner arrived at the WCSO (*see id.* at 125–77).

Lastly, liberally construing the instant claim as a contention by Petitioner that he is actually innocent or otherwise entitled to relief based on "newly discovered evidence" (that is, his discovery in or about May 2006 of the investigator's belief that his confession and other evidence were subject to suppression), Petitioner's contention is without merit. Initially, the investigator's statement is not "evidence," regardless of when it was discovered, and it does not establish that Petitioner's Fifth Amendment right against self-incrimination was violated. Furthermore, as previously discussed, the record does not support a finding Petitioner's Fifth Amendment right was violated.

Additionally, while not directly on point, the Supreme Court's guidance in <u>Schlup v. Delo</u>, 513 U.S. 298, 326–27, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995) is instructive. There, the Supreme Court set forth the standard of proof governing a procedurally defaulted habeas petitioner's claim of actual innocence: the petitioner must show that constitutional error "probably resulted" in the conviction of one who is actually innocent. 513 U.S. at 324. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.* (citation omitted).

Here, it is evident that Petitioner has not supported his claim with new reliable evidence. The only factual support for this assertion is the affidavits of his family, which include hearsay statements as to the substance of the unidentified investigator's statements to them and to Attorney Smith; Petitioner's family members do not allege to have personal knowledge of the substance of any discussion between Smith and the investigator concerning the circumstances of the confession. Therefore, the affidavits are insufficient to support Petitioner's assertion that Attorney Smith knew that circumstances existed indicating that the police unlawfully obtained Petitioner's first confession. Petitioner has therefore failed to show that any constitutional error occurred, much less error that probably resulted in the conviction of an actually innocent person. Thus, even under a liberal construction of Petitioner's claim, he is not entitled to relief.

IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Walter McNeil is substituted for James McDonough as Respondent.

And, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (Doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 25<u>th</u> day of May 2010.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).